Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, May 05, 2010 9:19:31 AM

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| QUAIL FARM, LLC | ) | Case No. 09-bk-298 |
| | ) | |
| Debtor. | ) | Chapter 11 |

**MEMORANDUM OPINION**

Stephen and June Qualls (the "Quallses"), seek the dismissal or conversion of the Chapter 11 case of Quail Farm, LLC (the "Debtor") pursuant to § 1112(b) of the Bankruptcy Code. The Quallses' motion is opposed by the Debtor and Dan Ryan Builders, Inc. ("DRB"), who holds a lien subordinate to the Quallses. A hearing on the motion was held on April 8, 2010.[1]

For the reasons stated herein, the court will grant the Quallses' motion and dismiss the Debtor's case.

**I. BACKGROUND**

The Debtor is a single-member limited liability company, whose sole asset is an 88.3-acre tract of land in Morgan County, West Virginia that it purchased from the Quallses on January 10, 2006, for $900,000. The Debtor purchased the land to develop a 56-lot residential subdivision named Huntington Farms.

To finance the purchase, the Debtor issued to the Quallses a $700,000.00 promissory note, secured by a first deed of trust. As of the April 8, 2010 hearing, the Quallses were owed

---

[1] The provisions of § 1112(b)(3) require that a court render its decision regarding a motion filed under § 1112(b) within 15 days after the hearing unless, absent agreement by the moving party, compelling circumstances prevent the court from meeting that deadline. The delivery of this decision falls beyond the stated time frame. However, the delay was due to the press of other equally urgent business of the court.

1

$627,346.00 on the note. To finance the development of Huntington Farms, the Debtor granted a second deed of trust to DRB. The balance on the debt owed to DRB is about $560,000.00.

Development of the first 22 lots ("Phase I") of Huntington Farms is complete, except for final paving. The remaining section of the development ("Phase II"), consisting of 34 projected lots, requires substantial improvement before the Debtor may lawfully commence sales. According to Elizabeth Gorse, the County Planner of Morgan County, West Virginia, the Debtor submitted a 56-lot plat to the Morgan County Planning Commission for approval of the entire Huntington Farms subdivision in 2006. The Planning Commission granted preliminary plat approval, and, then, in December 2007, granted final approval regarding Phase I, upon completion by the Debtor of the required infrastructure. Although preliminary approval required paved roads throughout the subdivision, the Debtor has continued to seek and obtain extensions on the pavement requirement, and, as of the date of the hearing in this matter, neither Phase I nor Phase II has paved roads.

Although lot sales from Phase I are permitted pursuant to the Planning Commission's approval, the Debtor still remains obligated to pave the roads. Phase II is not ready for out sales since it requires substantial improvements in order to bring it to a point where plat approval by the Planning Commission can be obtained thus permitting lot sales to proceed. The cost estimates for all the capital improvements necessary to complete both phases of Huntington Farms are substantial, ranging from $225,000.00 to $473,000.00.

In 2008, around the time the lots in Phase I were ready for sale, the demand for unfinished lots fell sharply. The Debtor fell behind on monthly mortgage payments, and, the Quallses initiated foreclosure. On February 19, 2009, before the trustee appointed in the deed of trust could complete a foreclosure sale, the Debtor filed a bankruptcy petition under Chapter 11.

Before the petition date, the Debtor was able to sell one lot with a completed home. After filing bankruptcy, the Debtor sold an additional lot and filed a second motion to sell a lot to DRB with an option to purchase 19 more. However, that motion was withdrawn at the April 8, 2010 hearing in contemplation of filing a plan of reorganization.

The Debtor's sole member, Paul Van Wagner, testified that the Debtor had no cash on hand, which has caused a post-petition default on the Quallses' note and a failure to pay ad valorem real property taxes. Mr. Van Wagner explained, however, that he plans to seek post-petition financing that would: (1) enable the Debtor to pay off the Quallses' secured claim, (2) allow the Debtor to pay

2

delinquent real estate taxes, and (3) pay for the improvements to Huntington Farms required to obtain final approval from the Planning Commission on Phase II. According to Mr. Van Wagner, post-petition financing and time are all that stand between the Debtor and its ability to sell lots. Although Mr. Van Wagner had not approached any lenders as of the April 8, 2010 hearing, he believed that he could have a post-petition financing deal completed and a plan filed within 45 days.

## II. DISCUSSION

The Quallses urge the court to dismiss or convert the Debtor's case on three grounds: 11 U.S.C. §§ 1112(b)(4)(A), (I), and (E).[2] Because the court finds that the Quallses have demonstrated that cause exists to dismiss the Debtor's case under § 1112(b)(4)(A), the court will not consider the other grounds for dismissal raised by the Quallses.

Bankruptcy Code § 1112(b)(1) provides that "the court shall convert . . . or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate if the movant establishes cause . . . ." 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) contains a non-exhaustive list of causes that support dismissal. Once a moving party establishes cause, the court shall dismiss the case unless the non-moving party is able to show that unusual circumstances exist such that dismissal is not in the best interest of creditors. 11 U.S.C. § 1112(b)(1). As for all causes other than that described under § 1112(b)(4)(A), the court "shall not" dismiss a case, where unusual circumstances exist such that dismissal is not in the best interest of creditors, and a non-moving party establishes that (1) "there is a reasonable likelihood that a plan will be confirmed" and (2) cause is justifiable and "will be cured within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2). Thus, even in the face of cause for dismissal being demonstrated, a debtor may still withstand a motion to dismiss if the criteria of § 1112(b)(2) are met. But, if cause is established by virtue of § 1112(b)(4)(A), then the provisions of § 1112(b)(2) do not apply.

Cause for dismissal under § 1112(b)(4)(A) requires the movant to establish: (1) that the estate suffers from "substantial or continuing loss or diminution" and (2) that there is no "reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). Since the requirements are stated in the conjunctive, both elements must be present in order for relief to be granted. *Canpartners Realty*

---

[2] The Quallses also raised § 1112(b)(4)(J) as a grounds for dismissal but dropped that grounds in their post-hearing briefing.

3

*Holding Co. IV, L.L.C. v. Vallambrosa Holdings, L.L.C. (In re Vallambrosa Holdings, L.L.C.)*, 419 B.R. 81, 89 (Bankr. S.D. Ga. 2009). The purpose of § 1112(b)(4)(A) is "to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Loop Corp. v. United States Trustee*, 379 F.3d 511, 515 (8th Cir. 2004) (internal quotation marks omitted).

**A.    Substantial or Continuing Loss or Diminution to the Estate**

To show that the Debtor has incurred substantial or continuing loss or diminution to the estate, the "[m]ovant must show that the Debtor continues to incur losses or maintains a negative cash flow position after the filing of the bankruptcy petition." *In re Roan Valley, LLC*, Case No. 09-13220, 2009 Bankr. LEXIS 4246, at *6 (Bankr. N.D. Ga. November 25, 2009). The absence of a reliable source of income together with the inability to pay current expenses is sufficient to show continuing loss. *E.g., Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Memorial Corp.)*, 386 B.R. 548, 551 (Bankr. D. Del. 2008). Although negative cash flow is sufficient to establish the first element of cause under § 1112(b)(4)(A), even if a debtor has positive cash flow, continuing loss can be shown by an "'actual depreciation in the value of property of the estate.'" *In re Tolco Properties, Inc.*, 6 B.R. 482, 486 (Bankr. E.D. Va. 1980) (quoting *Collier on Bankruptcy*)).

The Debtor's estate in this case is suffering losses on two fronts: cash flow and asset value. The Debtor has not been able to generate a steady income stream. Meanwhile, its post-petition obligations to the Quallses and other creditors have continued to accrue. The Debtor has had over one year to attempt to fix its cash flow problems and market lots. Since the petition date, only one sale has occurred.[3] The sale enabled the Debtor to make a substantial payment to the Quallses, but it fell short of bringing it current with them by at least three months, and possibly more. That sale, however, was atypical of the Debtor's current business, in that it involved the sale of a finished home; a home that was completed under the auspices and financing of DRB. The Debtor does not

---

[3] Although the Debtor complained at the hearing that its post-petition attempts to sell lots has been unduly thwarted by the Quallses' objections in the bankruptcy case, the court disagrees with that characterization. Rather, as stated aptly by Mrs. Qualls during her testimony, the basis for their objections were nothing more than an assertion of their rights to proceeds as first lien holders. They did not object to the proposed sales; they objected to the proposed distribution of the proceeds.

4

propose to build homes on its lots; instead, the Debtor's business moving forward will involve only the sale of unimproved lots. Although the Debtor asserts that the demand for completed homes is better than the demand for unimproved lots, the Debtor is not in the business of selling completed homes. The Debtor apparently hopes that through DRB's building activities on Huntington Farms, the Debtor's remaining lots will increase in value, thus, providing additional cash flow and/or other value for the bankruptcy estate.[4] That hope is not a reliable source of income.

The Quallses presented convincing evidence through the testimony of Kent W. Kesecker, a qualified real estate appraiser, that over the past six months there has been no demand for unimproved residential lots in the real estate market surrounding Huntington Farms. The Quallses have also shown that the following expenses continue to accrue: ongoing mortgage payments, tax payments, state and local permit renewal fees, and the improvement costs necessary to obtain final plat approval for Phase II by the Planning Commission. The court finds that the Debtor has no reliable source of income and a negative cash flow, both of which constitute a continuing loss and diminution to the estate.

The value of the estate's property is also declining precipitously. The Debtor "stipulated" at the hearing that the value of its real property is $286,000.00.[5] That figure is a far lower value than any party presented at an earlier hearing on the Quallses' motion for adequate protection on September 21, 2009. At that hearing, the Debtor asserted that the property was worth $1,190,000.00 and the Quallses asserted a value of $642,640.00. In resolving the Quallses' motion for adequate protection, the court found insufficient evidence of a fixed value, but that the Quallses' valuation of $642,640.00 was too low. The Debtor now asserts a valuation that is roughly 44% of even the lowest valuation urged by the parties only 7 months ago. The Debtor's tendered valuation is

---

[4] The Debtor presented no projections or other concrete evidence on this point.

[5] Although at the hearing both the Debtor and DRB proposed to stipulate to the value of the property as $286,000, the Quallses refused to do so despite the fact that their expert testified to that figure as the best estimate of the property's current value. Mr. Kesecker derived that amount using a development approach to valuation which projected sales of lots from both Phase I and Phase II over the next 6 ½ years, and discounted to present value the cash flows to be generated from the sales after certain deductions. Based upon the evidence adduced at the hearing, the court accepts the value of the property as $286,000 for purposes of its disposition, despite the lack of a formal stipulation among the parties.

5

supported by the testimony of Mr. Kesecker. According to Mr. Kesecker, the market for residential real estate in the Morgan County region has deteriorated further in the months since he last testified on September 21, 2009. Taken together, the Debtor's asserted valuation of $286,000 and Mr. Kesecker's expert testimony, convincingly show that the estate's sole asset has substantially declined in value since the filing of the petition. Thus, the estate is suffering from continuing loss in the form of negative cash flow and a diminishing value in its sole asset.

**B.     No Reasonable Likelihood of "Rehabilitation"**

The second prong of § 1112(b)(4)(A), requires the movant to show that the debtor has no reasonable likelihood of rehabilitation. Rehabilitation does not necessarily equate with reorganization. They are related but distinct concepts. Rehabilitation in the context of § 1112(b)(4)(A) "contemplates the successful maintenance or re-establishment of the debtor's business operations . . . ." *Vallambrosa Holdings,* 419 B.R. at 88 (internal quotation marks omitted); *see also Loop*, 379 F.3d at 515 ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business."). Because a Chapter 11 plan of reorganization may include liquidation, the test under § 1112(b)(4)(A) is not whether the debtor can confirm a plan, but, rather, "whether the debtor's business prospects justify continuance of the reorganization effort." *Vallambrosa Holdings,* 419 B.R. at 88 (internal quotation marks omitted); *see also Loop*, 379 F.3d at 515 ("'Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation.'") (quoting *In re The Ledges Apartments*, 58 B.R. 84, 87 (Bankr. D. Vt. 1986)). Thus, rehabilitation requires, "at minimum, the prospect of re-establishing a business." *Vallambrosa Holdings*, 419 B.R. at 88. Finally, when a debtor proposes to reorganize by continuing to do business as opposed to liquidation, the court must concern itself with whether the "debtor has formulated, or can formulate within a reasonable amount of time, a reasonably detailed business plan." 7 *Collier on Bankruptcy* ¶ 1112.04[6][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010).

Here, the Quallses have shown that the Debtor has no reasonable likelihood of rehabilitation, and the court finds that it is highly unlikely that the Debtor will successfully rehabilitate its business through the continuation of the bankruptcy process. At the hearing, the court received only the weakest of evidence from the Debtor regarding a business plan. The Debtor merely offered that, if

6

permitted to remain in bankruptcy, it would propose a plan of reorganization within 30 to 45 days. The outlines of the plan, as testified to by Mr. Van Wagner, would cram down the secured claim of the Quallses to $286,000, treat the rest of their claim as unsecured, as well as that of DRB, pay the outstanding real estate taxes, and obtain financing in an undetermined amount sufficient to pay the Quallses secured claim in full, to pay the unsecured debt over time, and to pay for the substantial costs necessary to complete the development of Huntington Farms.  But that is all the court heard, and, in the court's view, the plan as offered by the Debtor for rehabilitating its business, while well-meaning and earnest, was long on hope and short on details.

   The court heard no solid or convincing evidence from the Debtor regarding the financial wherewithal to support its proposal to rejuvenate itself.  For instance, no income projections from future operations were presented.  Such evidence would be pertinent because, since the inception of the case, the Debtor has been unable to demonstrate any concrete evidence of financial progress. In the 400 plus days that this case has been in bankruptcy, the Debtor has only managed to sell one lot, and as previously noted, that was a unique sale, largely facilitated by DRB.  The Debtor possesses only one asset, the real estate comprising Huntington Farms, and it proposes to use the land to secure post-petition financing in conjunction with a plan of reorganization when the value of its sole asset, by its own estimation, has dramatically declined in value since the outset of the case.  Indeed, the likelihood of obtaining such financing seems quite remote when the collateral is already so far underwater.  There was a complete lack of specifics as to the size of the loan to be obtained, its proposed terms, and the mode of meeting its obligations based on a viable business plan.[6]  Moreover, upon cross examination, Mr. Van Wagner was unable to name any lender with whom he has spoken about such a proposition, nor was he able to offer any commitment by a lender to the Debtor's concept.  Finally, Mr. Kesecker's testimony about the collapse of the real estate market in Morgan County was convincing, and demonstrated the lack of a realistic opportunity for

---

[6] The loan as envisioned by the Debtor would need to be sizable enough to not only pay off the Quallses' crammed down claim (assuming that a plan could be confirmed), but, among other things, to finance the remaining development costs of the project.  The evidence showed that the costs ranged from as low as $225,000 to as high as $473,000.  Mr. Van Wagner could not provide a specific figure as to the costs, although by his estimates it could range from $250,000 to $350,000;  the uncertainty of which demonstrates the shortcomings of the Debtor's projections and the ill-formed nature of its plans.

7

the Debtor's rehabilitation in the foreseeable future; a proposition that was not effectively, if at all, rebutted. The Debtor's business plan is thus nothing more than speculation and, as such, is insufficient to support a contention that there is a likelihood of rehabilitation.

The Debtor argues, with the support of DRB, that it has been unable to move forward with the development of a business plan, or to explore financing options, because a value for Huntington Farms was not established until the hearing on the Motion to Dismiss based on Mr. Kesecker's testimony. The court finds that argument unconvincing. First, the Debtor or DRB could have pressed at any time during the history of the case for a definitive valuation. Indeed, the court's ruling on the Quallses' motion to lift stay delivered on September 21, 2009, provided a path forward regarding valuation. Second, the Debtor was free to propose a plan of reorganization at any time incorporating its postulation regarding value, and the terms for dealing with its creditors based on that figure. Third, instead of affirmative action on these fronts by the Debtor, it now seeks to expropriate the work of the Quallses' regarding valuation, and to use their initiative against them, further impressing upon them the expense and risk associated with reorganization.

### C.   Unusual Circumstances that Negate Dismissal

The Debtor and DRB attempt to show that this case is out of the ordinary on two main grounds. First, according to the Debtor, the court's failure to make a finding as to the fixed value of Huntington Farms as of the date of the September 21, 2009 hearing left the Debtor in limbo. This excuse is without merit, and does not constitute an unusual circumstance. The Debtor has been entitled to request relief under § 364(d) and/or submit a plan of reorganization since February 10, 2009. The court's decision to decline to find a value was based upon the fact that the Quallses failed to carry their burden of proof as to valuation, and that the Debtor failed to show an alternative value. As noted previously, no part of that ruling hampered the Debtor in carrying out its prerogative of proposing a value for other purposes, such as obtaining post-petition financing and/or proposing a plan. Thus, the ruling does not make the circumstances of this case unusual.

Second, the Debtor and DRB assert that the Quallses' lack of cooperation has hampered the Debtor's abilities to rehabilitate. This excuse also lacks merit, and is not an unusual circumstance. The Quallses have done nothing more than to protect their vested interest in the Debtor's real estate, which is a common modus operandi for secured creditors in bankruptcy cases. The Debtor's last sale motion proposed to allow DRB, whose lien is subordinate to the Quallses, to receive a

8

$10,000.00 release fee, even though the Debtor had no authorization to use cash collateral. As noted earlier herein, the court cannot fault the Quallses from objecting to the Debtor's attempt at upending the priority of secured creditors in this case, and demanding adequate protection in the sale of their collateral.

The Quallses' have carried their burden of proof under § 1112(b)(4)(A), and neither the Debtor nor DRB have shown any unusual circumstances mitigating against dismissal. Thus, the court is mandated to grant relief on the basis of § 1112(b)(4)(A).

**D.      Relief**

Given that the Quallses have established cause for relief under § 1112(b)(1), it is incumbent upon the court to either convert the case to a Chapter 7 case or dismiss it, whichever option is determined by the court to be in the best interests of the creditors and the estate. Here, the court believes that it would be in the best interests of the creditors and the estate to dismiss the case. This is so because the schedules show that there are only two unsecured creditors, and the value of the real property - the sole asset of the bankruptcy estate - is insufficient to satisfy the secured claims of the Quallses and DRB. Thus, there are no assets in the estate for a Chapter 7 Trustee to administer thereby making administration of the case in a Chapter 7 context imprudent and unnecessary.

### III. CONCLUSION

For the above stated reasons, the court will enter a separate order that grants the Quallses' motion by granting dismissal of the Debtor's case based upon cause established under § 1112(b)(4)(A).